The Carroll Chain Company v. Commissioner.
Carroll Chain Co. v. Commissioner
Docket No. 9799.
United States Tax Court
1947 Tax Ct. Memo LEXIS 153; 6 T.C.M. (CCH) 778; T.C.M. (RIA) 47182; June 30, 1947
Carl Tangeman, Esq., 52 E. Gay St., Columbus, O., Webb I. Vorys, Esq., and D. S. Bolon, C.P.A., for the petitioner. John O. Durkan, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion In this case the Commissioner determined a deficiency in petitioner's excess profits tax in the sum of $10,615.72 for the fiscal year ended June 30, 1943. At the hearing the first two issues presented by the petition and answer were withdrawn from consideration by the petitioner leaving for our consideration the sole question whether the Commissioner erred in reducing the deduction for compensation paid to R. D. Gantz, president and general manager, from $23,677.90 to $18,823.73, and the compensation of R. W. Waterstrat, vice-president and factory superintendent, from *154 $14,257.70 to $11,830.61. Findings of Fact The petitioner is a corporation organized in 1921, with its principal place of business in Columbus, Ohio. Its tax returns for the fiscal year ended June 30, 1943, were made on an accrual basis and were filed with the collector of internal revenue for the 11th district of Ohio, at Columbus. The petitioner corporation was engaged in the manufacture of chain of various sizes, primarily anchor chain for repair docks, floating dry docks and barges, and some ship anchor chain. R. D. Gantz first became associated with the company in 1935 as a stockholder and treasurer. In 1938 he was elected president of the corporation and since that time has been president and general manager. R. W. Waterstrat was first employed by the petitioner in 1937 as factory superintendent and later became a vice-president of the corporation. Neither of these individuals owned controlling stock in the corporation. During the year involved and for several years prior thereto Gantz and Waterstrat were the executive and managing officers in charge of the business of the company. Gantz, as general manager, had charge of contracts, financing and other administrative *155 arrangements, and Waterstrat, as factory superintendent, had charge of the shops, production and related matters. From 1935 to 1939 the gross sales were relatively small, averaging less than $135,000 per annum. During some of those years the petitioner operated at a loss. In 1940 and 1941, due to contracts with Great Britain for anchor chain, petitioner's business increased materially and began to show a margin of profit. In those years from 70 to 75 per cent of the output was sold to Great Britain. These contracts were referred to as defense contracts. Gross sales in 1941 were in excess of $430,000. In 1942 and 1943 petitioner entered into what are referred to as war contracts with the Navy Department of the United States, and at the urgent request of the Navy Department engaged additional employees and went on three eight-hour shifts per day six days a week (Sunday being used to repair machinery and equipment). In this manner production was stepped up rapidly and gross sales for the fiscal year involved in this proceeding were in excess of $1,700,000. During this period petitioner continued to supply some anchor chain to Great Britain but most of its output went to the Navy *156 Department. About 90 to 95 per cent of the total output was sold to Great Britain and the United States under the so-called defense or war contracts. The large increase in production and sales came in 1942 and 1943 after the United States Navy Department had erected a building expanding petitioner's plant and urged increased production. The Navy Department paid for the erection of the building in question but the petitioner had to supply and pay for the additional tools, machinery and equipment, and had to take care of the increased payroll and finance the purchase of additional supplies necessary to the increased production. During the years 1942 and 1943, due to plant expansion, increase in the number of employees and the increase in production and sales, the administrative duties of the two executive officers here involved were materially increased. Among many other additional duties, Gantz, the general manager, was required to make trips to Washington, D.C., to contact Navy Department officials, was required to interview many Navy Department officers and inspectors from Washington and Cincinnati at his own office, and had to make arrangements for the financing and obtaining *157 of additional supplies incident to the larger operations. Waterstrat was required to obtain and train additional employees and look after the making of special tools, machinery and equipment for the expanded plant and to put the whole plant on three eight-hour daily shifts in order to increase production to the extent required by the additional war or defense contracts. Both Gantz and Waterstrat, during the fiscal year in question, worked long hours (8 to 18 hours per day, including Sundays) looking after matters growing out of the increased production demanded for the filling of the war and defense contracts in question. The petitioner paid Gantz a regular salary of $12,000 per year and Waterstrat a regular salary of $8,418.75. Good chain makers working under their supervision during the year in question made from $7,000 to $8,000 per year. On August 19, 1942, petitioner, by agreement set forth in its minutes, contracted to pay the two above-mentioned officers in addition to their regular salaries six per cent of the profits for the fiscal year. This was to be divided four per cent to Gantz and two per cent to Waterstrat. The minutes of the petitioner corporation wherein this *158 agreement appears read as follows: "The Carroll Chain Company "Minutes of Meeting of Board of Directors "Pursuant to notice duly given according to law, the by-laws and regulations of The Carroll Chain Company, a meeting of the Board of Directors of said company was held at the Company's office in the city of Columbus, on August 19th, 1942. A quorum of Directors as follows were present in person. Charles Burlett Hugo Frankenberg Ray D. Gantz Ray W. Waterstrat "Mr. Ray D. Gantz acted as Chairman and Mr. Charles Burlett as Secretary of the meeting. "In view of the plant expansion just completed with its resulting increase in responsibilities for Ray W. Waterstrat as plant superintendent and Ray D. Gantz as President and Treasurer it is considered advisable for the Company to enter into a profit sharing arrangement with the management in lieu of paying bonuses and making salary adjustments. "Upon motion duly seconded, the following resolution was adopted. "Resolved: that the Corporation enter into an agreement with Ray W. Waterstrat and Ray D. Gantz whereby they shall jointly receive as additional compensation over and above their present salaries six (6) per cent of *159 the profit of the corporation before Federal and State Income and Excess Profits Taxes. Division of the six per cent to be one-third to Ray W. Waterstrat and two-thirds to Ray D. Gantz. Provided, however, that this agreement shall be in-operative in the event the Corporation's profit before such above mentioned taxes does not exceed $75,000.00. "There being no further business before the meeting it was, on motion made and seconded, adjourned." (Signed) Charles Burlett Secretary (Signed) Ray D. Gantz Chairman On September 3, 1943, after the close of the fiscal year and the determination of the profits of the petitioner, Gantz was paid as his portion of the said additional compensation $11,677.90 and Waterstrat was paid $5,838.95, making the total compensation paid to the above said parties for services rendered during the fiscal year ended June 30, 1943, $23,677.90 and $14,257.70, respectively. The parties to the above agreement construed it to mean that the additional remuneration was to be computed on the profits of the petitioner before renegotiation and before paying federal or state income and express profits taxes. In 1944 the petitioner's contracts were renegotiated *160 and the petitioner was required to return to the Navy Department the sum of $127,500 as excessive profits on its war contracts for 1943. The rapid increase in the volume of the petitioner's business from the year 1939 through the year 1943 is shown by the following tabulation: THE CARROLL CHAIN COMPANY
COMPARATIVE OPERATING INFORMATION AND PERCENTAGES EXCLUDING
ADJUSTMENTS PROSPOSED BY EXAMINING OFFICER
Year Ended June 30
7/1/35 to
6/30/39
1943
1942
1941
1940
Average
SALES (Net)
Amount
$1,714,029.55
$695,427.92
$431,824.18
$157,549.63
$134,196.79
Percent of Base
1,277.2%
518.3%
321.8%
117.4%
(Base)
Pounds
16,404,405
6,463,437
4,674,166
1,612,125
1,363,171
Percent of Base
1,203.4%
474.2%
342.9%
118.2%
(Base)
7/1/35 to
6/30/39
1943
1942
1941
1940
Average
SELLING AND ADMINISTRATIVE
EXPENSE
Amount
$ 54,481.29
$ 30,908.60
$ 32,136.53
$ 19,667.27
$ 21,934.48
Percent of Base
248.4%
140.9%
146.5%
89.7%
(Base)
Percent of Sales (Net)
3.2%
4.4%
7.4%
12.5%
16.3%
SALARIES OF MANAGEMENT
Amount - General and Factory
$ 37,954.35
$ 18,567.25
$ 13,605.00
$ 10,200.00
$ 9,576.89
Percent of Base
396.3%
193.9%
142.1%
106.5%
(Base)
Percent of Sales (Net)
2.2%
2.7%
3.2%
6.5%
7.1%
NET PROFIT
Amount
$ 50,738.94
$ 55,902.84
$ 31,844.31
$ 6,004.90
$ (Loss)
Percent of Sales (Net)
2.96%
8.04%
7.37%
3.81%
Percent of Net Worth
32.24%
47.23%
32.95%
6.21%
DIVIDENDS PAID
Amount
$ 16,860.00
$ 16,910.00
$ 10,116.00
$ 5,058.00
Percent of Net Profit
33.23%
30.25%
32.77%
84.23%
Percent of Net Worth
10.71%
14.29%
10.47%
5.23%
SUMMARY OF OPERATIONS
SALES - Net
$1,714,029.55
$695,427.92
$431,824.18
$157,549.63
COSTS - Mat'l, Labor and Expense
1,439,598.85
570,208.80
381,777.57
150,767.73
PROFIT
$ 274,430.70
$125,219.12
$ 50,046.61
$ 6,781.90
DISTRIBUTION
Excessive Profits (Renegotia-
tion Refund)
$ 127,500.00
Income and Excess Profits Tax
96,191.76
69,316.28
18,202.30
776.94
Company's Share
50,738.94
55,902.84
31,844.31
6,004.90
Total
$ 274,430.70
$125,219.12
$ 50,046.61
$ 6,781.84
*161 The statement attached to the deficiency notice herein reads in part as follows: "(c) It is determined that the deduction claimed in your return for the taxable year ended June 30, 1943, for compensation of officers exceeded a reasonable allowance for compensation for services actually rendered within the meaning of section 23(a) of the Internal Revenue Code as follows: Amount
Amount
Amount
Officer
Deducted
Allowed
Disallowed
R. D. Gantz
$23,677.90
$18,823.73
$4,854.17
R. W. Waterstrat
14,257.70
11,830.61
2,427.09
Totals
$37,935.60
$30,654.34
$7,281.26
"It is determined also that the deduction claimed in your return for the taxable year ended June 30, 1943, for compensation of officers exceeded the liability you incurred therefore during the taxable year to the extent of the amounts disallowed." The salaries of $23,677.90 and $14,257.70 paid to Gantz and Waterstrat, respectively, were reasonable compensation for services rendered during the taxable year. Opinion LEMIRE, Judge: The petitioner having withdrawn other issues this case comes to us on the sole question of whether or not the Commissioner erred in disallowing *162 as a deduction a part of the additional remuneration which petitioner paid R. D. Gantz and R. W. Waterstrat under the agreement set out in the minutes of August 19, 1942. The respondent's contention in regard to this partial disallowance is two-fold. One of these contentions is that the petitioner was only liable under the agreement for six per cent of the profits after renegotiation and therefore did not incur any liability in excess of that amount. The parties to the agreement, however, have construed it to provide for the payment of six per cent of the net profits of the petitioner for the fiscal year involved before renegotiation, and Gantz and Waterstrat have been paid on that basis. This payment was made on September 3, 1943, and within 75 days after the end of the fiscal year on June 30, 1943. Since the contract is susceptible of more than one meaning we think that the interpretation which the parties themselves have given it should be accepted unless clearly wrong, which is not the case. See Courtright v. Scrimger, 110 Ohio St. 547; 144 N.E. 294; Williston on Contracts, Revised Edition, Vol. 3, par. 623. The respondent also contends that the total *163 remuneration of $23,677.90 paid to Gantz and $14,257.70 to Waterstrat for the year involved is unreasonable and excessive. We cannot agree with respondent's contention in this regard. The facts show that these officers had long years of experience in the highly specialized business in which they were engaged and by reason thereof possessed technical skill and knowledge of great value to the petitioner. The tools, machinery and patterns used in connection with the business were practically all non-standard and had to be designed and built in petitioner's plant. This was all done under the supervision of Gantz and Waterstrat. During the year in question these officers improved the design and patterns of the tools and machinery in use. They worked long hours and devoted all their time to the business. Laborers working under their supervision were paid $7,000 to $8,000 per year. The total compensation paid to Gantz and Waterstrat was comparable to salaries paid by comparable concerns to executives performing similar services. The corporation paid dividends in excess of $16,000. The evidence shows that the increased sales for the year involved were primarily due to the national defense *164 and war effort, but it is likewise obvious that the increased production and sales materially increased the duties and responsibilities of Gantz and Waterstrat. We find that the compensation paid them by the petitioner was reasonable and the Commissioner erred in disallowing any part thereof. Decision will be entered under Rule 50.